## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| American Financial Resources, Inc., | **Civil Act. No.:** |
| *Plaintiff* | |
| v. | **COMPLAINT** |
| Chaos Home Loans, LLC; and Collin Psioda | **AND DEMAND FOR JURY TRIAL** |
| *Defendant(s)* | |

American Financial Resources, Inc. ("AFR" and/or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against Chaos Home Loans, LLC ("Chaos") and Collin Psioda ("Psioda") (collectively, "Defendants") states and alleges as follows:

### PARTIES

1. AFR is a New Jersey corporation engaged in the business of originating, brokering, and purchasing and transfer of certain residential mortgage loans, including servicing rights, with a principal place of business at 9 Sylvan Way, Parsippany, New Jersey 07054.  For purposes of diversity jurisdiction, AFR is a citizen of New Jersey.

2. Upon information and belief, Defendant Chaos is a Nevada limited liability company engaged in the business of originating, and the subsequent sale and transfer of certain residential mortgage loans, including servicing rights, with a principal place of business at 5195 S. Durango Drive, Suite 101, Las Vegas, Nevada 89113 and having a registered agent for the service of process at Incorp Services, Inc., 3773 Howard Hughes Pkwy.,

Suite 500S, Las Vegas, Nevada 89169-6014.  For purposes of diversity jurisdiction,

Chaos is a citizen of Nevada (as, upon information and belief, Chaos' only Member –

Psioda – is also a resident of Nevada).

3.  Upon information and belief, Psioda is an individual and resident of Nevada, having an

address at 900 S. 4th Street, Las Vegas, Nevada 89101, principal and alter ego of Chaos.

For purposes of diversity jurisdiction, Psioda is a resident of Nevada.

4.  This Court has subject matter jurisdiction over AFR's claims under 28 U.S.C. § 1332(a)

because the amount in controversy exceeds $75,000, exclusive of interest and costs, and

the matter in controversy is between citizens of different states, Plaintiff being a citizen

of only New Jersey and all Defendants being citizens of Nevada.

5.  This Court has personal jurisdiction over each Defendant because: (a) with respect to

Chaos, the company possesses a Florida Mortgage Lender License #MLD1592, originally

issued February 19, 2018 and renewed through at least the present; is registered to do

business in Florida and actually does do business in Florida; and has a registered agent

for service of process at Paracorp Incorporated, 155 Plaza Office Drive, 1st Floor,

Tallahassee, Florida 32301; and (b) with respect to Psioda, he possesses a Florida

Mortgage Loan Originator License #L047481, originally issued October 3, 2017 and

renewed through at least the present, is the sole member of Chaos, which at times during

the relevant time periods was inactive and at those times therefore, Psioda personally was

doing business in Florida.  Both Defendants have consummated many transactions within

the State of Florida and the causes of action in this Complaint are based, in part, on the

failure of the Defendants to act according to a contract with AFR in connection with

residential mortgage loans in the State of Florida, and/or have otherwise acted or failed to

act in a manner that is in breach of its/his Florida licensure, also in connection with residential mortgage loans in the State of Florida.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and/or omissions giving rise to the claims occurred in this judicial district and a substantial part of the property that is the subject of the action is situated here.

## NATURE OF SUIT AND FACTS COMMON TO ALL COUNTS

7. On or about July 15, 2019, AFR entered into a certain Correspondent Origination and Sales Agreement with Chaos governing the origination, sale, and transfer of certain residential mortgage loans including the transfer of servicing rights (the "Contract"). Specifically, the Contract provided for Chaos offering for sale, and AFR purchasing, certain residential mortgage loans in accordance with the terms and conditions of the Contract.  A true and correct copy of the Contract is attached hereto as **Exhibit A**.

8. On or about July 15, 2019, AFR entered into a certain Delegated Underwriting Addendum agreement with Chaos providing for the ability of mortgage loans being offered for sale to AFR under the Contract be underwritten under delegated underwriting authority in accordance with the terms and conditions as stated therein (the "Contract Addendum").  A true and correct copy of the Contract Addendum is attached hereto as **Exhibit B**.

9. The Contract and Contract Addendum are governed by New Jersey law, although there is no provision for any particular consented jurisdiction or venue.

10. Since uponn and after entering into the Contract and Contract Addendum, Chaos has offered certain mortgage loans for sale to AFR and AFR has purchased certain mortgage loans from Chaos.

11. Pursuant to the Contract and the Contract Addendum, upon purchase and sale of a residential mortgage loan from Chaos to AFR, Chaos must deliver to AFR the related loan file and credit file, as well as all "trailing documents" (documentation that occurs and/or is created after the sale, such as, but not limited to, the mortgage after it has been returned from the applicable recording office and been recorded and title policies).

12. Pursuant to the Contract and Contract Addendum, upon discovery of a breach of any of the representations, warranties, covenants, or agreements set forth therein by Chaos, AFR may give notice of such breach to Chaos and Chaos thereafter has sixty days to cure such breach.  If the sixty days expire without such cure, or, alternatively, in the sole but reasonable discretion of AFR, the breach is incapable of cure, Chaos must promptly repurchase the affected residential mortgage loan at the defined repurchase price.

13. The Contract and Contract Addendum provide for certain events that, if they occur, trigger certain obligations, including but not limited to, repurchase obligations.

14. Among the repurchase triggering events provided for in the Contract is Chaos failing to provide all of the documentation required to be delivered to AFR and/or fails to satisfy all other requirements which Chaos is required to perform as of the purchase date of each mortgage loan within one hundred twenty days of such purchase date with respect to that loan.  AFR has the discretion, but not the obligation, to extend the trailing documentation deadline to one hundred eighty days for documents sent out for recording but not yet returned from the applicable recording office.

15. Another repurchase triggering event provided for in the Contract is if the loan file or credit file with respect a particular mortgage loan contains any fraudulent document or if AFR determines that a mortgage loan is subject to any fraud or misrepresentation,

involved in the origination or sale of such mortgage loan and it does not matter in this
event if that mortgage loan is delinquent or not.

16. Another triggering event provided for in the Contract is for an early payment default.
Chaos has agreed to pay AFR the sum of all amounts paid to Chaos by AFR over par plus
any amounts paid by AFR to Chaos for servicing released premium plus an
administrative fee of $3,000 if any of the first four payments due under any mortgage
loan become ninety or more days delinquent.

17. Among the triggering events provided for in the Contract Addendum is that in the event
AFR receives a demand for repurchase or indemnification in lieu of repurchase for a
mortgage loan by an entity to whom AFR has sold the mortgage loan (or its assigns or
successor in interest), such demand itself is deemed a breach of the related representation,
warranty, covenant or agreement of Chaos, regardless of the originating party, and the
related mortgage loan must be repurchased.

18. Another triggering event provided for in the Contract Addendum is that if any of the
documents associated with the mortgage loan are deemed to be not in compliance with
any federal or state regulation or act including but not limited to RESPA, HMDA, TILA,
MDIA, then the related mortgage loan must be repurchased.

19. The Contract Addendum provides that the repurchase price for each and all individual
mortgage loans required to repurchased thereunder is inclusive of: a) paying AFR $3000
reimbursement for administrative expenses; b) returning any SRP [service release
premium] paid to Chaos in connection with the original purchase by AFR of such
mortgage loan; c) reimbursing all yield spread premium paid above par that AFR paid to
Chaos for such mortgage loan; d) paying the then outstanding unpaid principal balance of

such mortgage loan; e) paying all accrued, but as of then yet unpaid interest and late charges; e) paying all escrow advances made by AFR; and g) paying any and all other miscellaneous expenses actually incurred by AFR with respect to the related mortgage loan.

20. The Contract further provides that in addition to any remedies available to AFR, Chaos is to also indemnify AFR against all losses, damages, fines, costs, or expenses of any nature related to, *inter alia,* any act or omission of Chaos and/or any non-fulfillment of any covenant [such as failure to provide trailing documentation, failure to pay the required amount for an early payment default, or to repurchase].

21. The Contract further provides that in connection with any litigation arising out of the enforcement of the Contract, AFR is entitled to recover all costs incurred including its attorney's fees, for services rendered before suit is brought, prior to trial, at trial, or appeal and in federal bankruptcy proceeding.

22. AFR attaches hereto as **Exhibit C**, a true and correct copy of a list of mortgage loans, properly redacted to comply with privacy concerns and also because the actual identity of any individual borrower is irrelevant to the issues complained of here, that AFR purchased from Chaos, but for which there remains after due notice and failure to act by Chaos and Psioda, a defect constituting a breach of the Contract and/or Contract Addendum and triggering a repurchase obligation or some other obligation.

23. At least four of the properties on **Exhibit C** relate to mortgage loans in connection with properties located in the State of Florida and three of those four are located in the Middle District of Florida.

24. AFR has provided written notice to Chaos and Psioda of the defects for each and every mortgage loan noted on **<u>Exhibit C</u>**.

25. In connection with many of the loans, the issue was as simple as providing the trailing documentation, such as the recorded mortgage and the related title policy.

26. In connection with one of the loans, namely, AFR Loan Number 92357854, (the "Repurchase Demand Loan"), there are significant defects and anomalies in the loan file and credit file that lead AFR's investor to require a repurchase by AFR, which triggered one or more of the triggering events under the Contract and Contract Addendum which requires Chaos to repurchase the Repurchase Demand Loan from AFR.

**The Repurchase Demand Loan**

27. To comply with privacy concerns, and because it is irrelevant to the actual matters complained of here, we will refer to the first borrower in connection with the Repurchase Demand Loan as Borrower ABC, and the cosigning borrower in connection with the Repurchase Demand Loan as Borrower XYZ.

28. Initially, in or around August or September of 2019, Borrower ABC identified a home they wanted to purchase and applied for a mortgage loan to purchase real estate with Chaos acting as their lender who obtained a credit report from Credit Information Systems. Borrower ABC's credit did not qualify him for the desired mortgage loan.

29. Thereafter, in early November 2019, Chaos obtained another credit report for Borrower ABC, via a request dated November 2, 2019 and the request completed on or around November 22, 2019.

30. On or about October 25, 2019, prior to any of the other documentation related to the Repurchase Demand Loan contained in the Repurchase Demand Loan file, Chaos,

through a request to Credit Information Systems by Psioda, obtained a credit report for Borrower XYZ. Borrower XYZ's credit ultimately allowed the Repurchase Demand Loan mortgage loan to be approved.

31. A wet signature allegedly for Borrower XYZ appears on loan documents related to the Repurchase Demand Loan dated December 3, 2019, December 5, 2019, December 12, 2019 and December 13, 2019.

32. An alleged copy of Borrower XYZ's social security card and driver's license appear in the loan file for Repurchase Demand Loan.

33. Borrower XYZ, after attempting to consolidate a construction loan with another loan for a project they were working on and being told they could not because of the Repurchase Demand Loan having closed in their name, Borrower XYZ investigated and determined their credit was used without their permission.

34. There are two signatures indicating Borrower XYZ dated December 3, 2019 in the Repurchase Demand loan file. Both are consistent with each other in that they generally tilt left and are fairly legible. None of the other Borrower XYZ signatures in the Repurchase Demand loan file tilt left.

35. The Borrower XYZ signatures on both the social security card and driver's license in the Repurchase Demand loan file are fairly neat and consistent with each other, and have very little tilt.

36. There is one signature for Borrower XYZ dated December 5, 2019 in the Repurchase Demand loan file. It is also fairly neat and has very little tilt, but is the only Borrower XYZ signature that dots an "i" in the signature.

37. There is one signature for Borrower XYZ in which a notary public crossed out December 13, replaced it with December 12 and initialed the change in the Repurchase Demand loan file.  The appearance of this signature is much less legible than the prior versions and is the only one that is purportedly occurring on December 12, 2019.

38. Chaos, as a mortgage lender, and as the underwriter for the Repurchase Demand Loan, is responsible for identifying and mitigating fraud risks.

39. The Repurchase Demand Loan closed on or about December 13, 2019.

40. There appear at least five instances of a wet signature for Borrower XYZ dated December 13, 2019 in the Repurchase Demand loan file, two of them notarized by the same notary public referred to above, and in one of those instances, December 12 was crossed out and replaced with December 13 and initialed.  In all of these instances, the first letter of the first and last names is legible, but almost no other portion of the signatures is legible.

41. Once Borrower XYZ appeared as a cosigner for the Repurchase Demand Loan, it closed relatively easily and quickly.

42. Sometime shortly after December 13, 2019, after this loan was underwritten and closed and funded, Chaos presented the Repurchase Demand Loan to AFR for purchase and AFR purchased it in early January, 2020 from Chaos.

43. Upon information and belief, Borrower XYZ was not the actual person whose identity was reflected by all of the identification related to Borrower XYZ, but was in fact, an imposter.

44. On or about July 7, 2020, the actual person who is identified by the driver's license and social security card used by Borrower XYZ at the closing of the Repurchase Demand Loan attempted to combine a construction loan to his existing loan and was told he could

not do so because he had purchased the home related to the Repurchase Demand Loan. This actual person identified by the Borrower XYZ documents stated he did not and that his identity must have been fraudulently used.

45. At that point, the actual person who is identified by the driver's license and social security card used by Borrower XYZ contacted the then owner of the Repurchase Demand Loan and informed them that their identity had been fraudulently used to open this loan.

46. Thereafter, the actual person who is identified by the driver's license and social security card used by Borrower XYZ, through Norton Lifelock, on or about July 23, 2020, filed an official fraud dispute with Amerihome Mortgage Company ("Amerihome"), the then owner of the Repurchase Demand Loan, AFR having sold the Repurchase Demand Loan to Amerihome.  The actual person who is identified by the driver's license and social security card used by Borrower XYZ signed a power of attorney in favor of LifeLock with a notary (not the same notary as in connection with the closing of the Repurchase Demand Loan) and the appearance of the wet signature on this document appears much different than any of the Repurchase Demand Loan wet signatures for Borrower XYZ contained in the Repurchase Demand Loan file.

47. The actual person who is identified by the driver's license and social security card used by Borrower XYZ also signed an affidavit and filed a police report on or around July 13, 2020 and also provided a copy of their true driver's license and social security card, which indicates a different picture and a wet signature consistent with the one on the affidavit, but not any of the ones in the Repurchase Demand Loan file.

48. The actual person who is identified by the driver's license and social security card used by Borrower XYZ was also in contact with Psioda and counsel for Chaos and Psioda and notified them of the fraudulent use of their identity.

49. Upon information and belief, the Borrower XYZ who appears in the Repurchase Demand Loan file and took part in closing this loan is not the same person as the actual person who is identified by the driver's license and social security card used by Borrower XYZ identification documents.

50. In a FraudGuard report November 12, 2019, there is an alert to Chaos that the reverse phone search listings indicate a possible identity issue and that further investigation is warranted.

51. In a follow up FraudGuard report dated December 9, 2019, a further alert is provided to Chaos that there is a critical risk and potential identity issue with respect to Borrower XYZ and the need to reverify and confirm this borrower's identity.  It is unclear from the contents of the Repuchase Demand Loan file what, if any, actions Chaos took to verify the identity of Borrower XYZ.

52. On or about September 23, 2020, after having sold the Repurchase Demand Loan to Amerihome, and Amerihome being provided with the above evidence, Amerihome demanded that AFR repurchase the Repurchase Demand Loan.

53. In turn, on or about September 28, 2020, AFR notified Chaos and Psioda of the repurchase demand and in turn, demanded Chaos repurchase the Repurchase Demand Loan.

54. In addition, since in or around March 2020, AFR has notified Chaos and Psioda about all of the missing trailing documentation in connection with each and every one of the mortgage loans identified on **Exhibit C**.

55. Thereafter, and recently, counsel for AFR has been attempting to work with Chaos, Psioda, and their counsel, to effectuate repurchase of the Repurchase Demand Loan and obtain all of the missing trailing documentation.

56. Although Chaos, Psioda, and counsel for the Defnedants have stated their intention to comply with their obligations under the Contract and Contract Addendum, to date, Chaos has not supplied any of the trailing documentation in connection with the enumerated mortgage loans nor repurchased the Repurchase Demand Loan.

57. In or around early December, 2020, AFR did in fact, repurchase the Repurchase Demand Loan from Amerihome.

58. The Repurchase Demand Loan should be repurchased under the Contract and Contract Addendum for approximately $500,000.

59. In connection with one other of the loans, namely, Loan Number 92356657, the issue is an early payment default, and in connection with that loan, the payment to AFR should be $12,296.64.

60. In connection with the fifty-four loans with trailing documentation issues, all are well past one hundred eighty days since the purchase date, triggering a repurchase obligation for all of them.  It is unknown at this time exactly what the unpaid principal balance is for each individual loan, as some have been sold to downstream investors.  Conservatively, using an average unpaid principal balance of two hundred thousand dollars, the amount due is well in excess of ten million dollars.

FIRST COUNT
Breach of Contract –All parties

61. Plaintiff repeats and realleges each and every preceding paragraph as if fully set forth at length herein.

62. The Contract and Contract Addendum together constitute a valid and enforceable agreement between AFR and Chaos.

63. AFR has fulfilled all of its obligations under the Contract and Contract Addendum with respect to all mortgage loans which are the subject of this action, having paid the purchase price for each and all of them and cooperated in all other material ways in connection with each and every one of them.

64. AFR has provided Chaos all required notice.

65. By not repurchasing the Repurchase Demand Loan as noticed and demanded, Chaos has breached its contract with AFR.

66. By not supplying all of the trailing documents in connection with each and every one of the loans as identified on **Exhibit C**, as noticed and demanded, Chaos has breached its contract with AFR.

67. By not paying the early payment default fee in connection with the proper demand to do so, Chaos has breached its contract with AFR.

68. AFR, through counsel and directly, has provided Chaos every opportunity to make good on its contractual obligations.  While admitting their obligations and promising to repurchase to Repurchase Demand loan and provide all of the missing trailing documentation, and pay the early payment default fee, Chaos remains in breach of their obligation.

69. To the extent that during any relevant time period, Chaos as an entity was not in active status, Psioda acted as Chaos and is the alter ego of Chaos and is therefore equally liable to AFR under the breach of contract.

70. As a direct and proximate cause of the breach of contract, AFR has been damaged.

71. AFR's remedies under the Contract and Contract Addendum include full repurchase of all of the affected mortgage loans.

SECOND COUNT
Unjust Enrichment – All parties

72. Plaintiff repeats and realleges each and every preceding paragraph as if fully set forth at length herein.

73. To the extent a breach of contract claim is inapplicable to either or both of Chaos and Psioda, each of Chaos and Psioda will have been unjustly enriched if not ordered to indemnify AFR for AFR's damages and/or repurchase the Repurchase Demand Loan and either immediately supply all missing trailing documents or repurchase all of the mortgage loans for which there remains outstanding trailing documentation, and to pay the early payment default fee.

74. By not repurchasing the Repurchase Demand Loan and by not providing all of the required trailing documentation or repurchasing them, and by not paying the early payment default fee, AFR is damaged.

75. Moreover, Chaos and Psioda would be allowed to retain money not used to repurchase the Repurchase Demand Loan and not used in providing the trailing documentation or repurchasing those loans, and not used in paying the early payment default fee.

76. The retention of this benefit that damages AFR is unjust.

77. Indeed, Chaos and Psioda would be incentivized to continue this inequitable behavior on other unsuspecting companies, make false promises, and continue unfazed and in fact, emboldened, by the Court's imprimatur on its activity.

78. As a result of the foregoing, AFR has to date borne the brunt of the damages it has suffered.

THIRD COUNT
Fraud - Psioda

79. Plaintiff repeats and realleges each and every preceding paragraph as if fully set forth at length herein.

80. Psioda, both personally and through counsel, promised via affirmative statements in or around November and December of 2020 on conference calls discussing the issues, to counsel for AFR and representatives Corey Dubnoff and Richard Dubnoff of AFR, that he would repurchase the Repurchase Demand Loan and provide all of the trailing documentation required in connection with each and every loan on **<u>Exhibit C</u>**.

81. Psioda made these promises to delay formal process and the filing of a lawsuit to obtain relief.

82. Psioda knew these promises were false when made but made them anyway with an intention that AFR rely upon them to delay action.

83. As litigation is costly and uncertain, it is not unreasonable to rely on promises that provide a method of relief without reliance on litigation and AFR reasonably relied on the promises of Psioda.

84. AFR in fact, relied upon the promises of Psioda and delayed filing this lawsuit.

85. Each day that passes and AFR does not have the repurchase price for the Repurchase Demand Loan and does not have the trailing documentation for every loan listed on **Exhibit C**, or a repurchase of those loans, AFR's damages increase.

86. By relying on the promises made by Psioda, AFR continues each day to be damaged in a greater and greater amount.

87. Psioda's fraudulent statements have caused AFR additional damages that it would not otherwise have.

RESERVATION OF RIGHTS TO AMEND

88. AFR reserves the right to amend this Complaint to include additional counts as may be warranted if it is discovered that Psioda, or anyone at Chaos had any intentional or grossly negligent action or failure to act that lead to the fraudulent use of Borrower XYZ's identity.

JURY DEMAND

89. AFR respectfully requests that this case be tried before a jury.

PRAYER FOR RELIEF

90. Based upon the foregoing allegations and claims, AFR respectfully prays that the Court grant the following relief:

   a. Awarding Plaintiff all monetary damages equal to all damages proved at trial, an amount believed to be the sum of the repurchase price for the Repurchase Demand Loan and the cost of obtaining and providing each of the required trailing documents, or alternatively, a the cumulative repurchase price of all the affected loans, an amount believed to be in excess of $10,000,000.00;

   b. Awarding Plaintiff compensatory, consequential and punitive damages;

    c.   Awarding Plaintiff both pre-judgment and post-judgment interest;

    d.   Awarding Plaintiff all attorney's fees and costs of suit;

    e.   Awarding Plaintiff such other and further relief as the Court finds equitable and

       just.

Respectfully submitted,

Dated:  12/31/2020
       Tampa, Florida

_____
Jack B. Baldini, Esq.
Florida Bar No. 1011265
Baldini Law, LLC
12557 Leatherleaf Drive
Tampa, Florida 33626
973.945.1645
jack@baldinilaw.com
Attorney for Plaintiff